# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-01055-MSK

JOHN SWOMLEY, TODD BARKER, DAVID GOLDSTEIN, ELIZABETH SWOMLEY, OLIVIA SWOMLEY, JAMES SWOMLEY, SARAH SWOMLEY, ROBERT COSINUKE, WILLA COSINUKE, JENNIFER KRIER, ABIGAYLE COSINUKE, AUGUST COSINUKE, KATHYRN VAGNEUR, BRUCE BARKER, GERRY BARKER, TOM STEWART, BARBRA STEWART, THOMAS H. STEWART, KATHERINE KENNEY, ERIC VOTH, MICHELLE VOTH,

Petitioners.

vs.

KAREN SCHROYER, in her official capacity as District Ranger, Aspen-Sopris Ranger District, White River National Forest, United States Forest Service, and

UNITED STATES FOREST SERVICE, a federal agency of the United States Department of Agriculture,

      Federal Respondents.

_____

## PETITIONERS' OPENING MERITS BRIEF

_____

John Swomley (BBO#551450)
Swomley & Tennen, LLP
50 Congress Street, Suite 600
Boston, MA 02109
Ph. (617) 227-9443
Fax (617) 227-8059
jswomley@swomleyandtennen.com
Attorney for Petitioners

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION.............................................................................................................. 1

JURISDICTION AND STANDING ..................................................................................... 1

BACKGROUND............................................................................................................... 4

    I.   The Project Area .................................................................................................. 4

    II.  Forest Health and Climate Change .................................................................... 5

    III.  The Upper Fryingpan Project ............................................................................. 7

    IV.  The National Environmental Policy Act ............................................................ 10

STANDARD OF REVIEW ............................................................................................... 12

ARGUMENT.................................................................................................................. 13

    I.   The Forest Service's refusal to discuss foreseeable greenhouse gas emissions or impacts on climate change was arbitrary and capricious. ......................... 13

        a.  The Forest Service failed to consider the reasonably foreseeable climate impacts of clearcutting and biomass combustion. .......................................... 13

        b.  The Forest Service failed to reasonably explain its refusal to consider greenhouse gas emissions and climate impacts. .......................................... 15

    II.  The Forest Service failed to adequately consider the Project's likely impact on mycelium. ...................................................................................................... 19

    III.  The Forest Service failed to prepare an EIS as required by NEPA. ................. 23

        a.  The Project will have indirect and cumulatively significant effects................. 24

        b.  The Project has been highly controversial among area residents, and there is a substantial dispute as to the effect of the action......................................... 26

        c.  The Forest Service's refusal to discuss climate impacts represents a decision in principle about future considerations. ......................................................... 28

CONCLUSION AND REQUEST FOR RELIEF ............................................................. 29

i

## TABLE OF AUTHORITIES

**Cases**

*All Indian Pueblo Council v. United States*, 975 F.2d 1437 (10th Cir. 1992) ................. 20

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87 (1983)............. 10

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) . 11, 29

*Center for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236 (D. Colo. 2011)......... 29

*Citizens for a Healthy Cmty. v. U.S. Bureau of Land Mgmt.*, 377 F. Supp. 3d 1223 (D. Colo. 2019) ....................................................................................................... 15, 28

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ............................... 12

*Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445 (10th Cir. 1996) ................... 3, 4

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172 (9th Cir. 2008) ...................................................................................................... 16, 18, 24

*Custer County Action Ass'n v. Garvey*, 256 F.3d 1024 (10th Cir. 2001)........................ 12

*Dine Citizens Against Ruining our Env't v. Klein*, 747 F. Supp. 2d 1234 (D. Colo. 2010). .................................................................................................................................. 11

*Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831 (10th Cir. 2019), *reh'g denied* (June 24, 2019) ..................................................................................... 25

*High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174 (D. Colo. 2014) .................................................................................................... 16, 17, 19

*Klamath-Sikiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989 (9th Cir. 2004) .................................................................................................................................. 25

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976). ................................................................. 11

*Massachusetts v. E.P.A.*, 549 U.S. 497 (2007). ............................................................. 24

*Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220 (10th Cir. 2002). ....... 27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ..passim

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) ........ 30

*Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288 (D.C.Cir.1988) ........ 20

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683 (10th Cir. 2009) ..................................................................................................... 12, 13, 18

*Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199 (2015) .................................................. 28

*San Juan Citizens All. v. Stiles*, 654 F.3d 1038 (10th Cir. 2011) .................................... 21

*San Juan Citizens All. v. Bureau of Land Mgmt.*, 326 F. Supp. 3d 1227 (D.N.M. 2018) ..................................................................................................... 17, 18

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985) ........................................................ 26

*Town of Superior v. U.S. Fish and Wildlife Serv.*, 913 F. Supp. 2d 1087 (D. Colo. 2012) ..................................................................................................... 28

*WildEarth Guardians v. Conner*, 920 F.3d 1245 (10th Cir. 2019) .................................. 27

*WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178 (10th Cir. 2013) ..................... 12

*WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677 (10th Cir. 2015) ........ 14

*WildEarth Guardians v. Bureau of Land Mgmt.,* 870 F.3d 1222 (10th Cir. 2017) ...passim

*WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019) ........................... 7, 15

*Wilderness Workshop v. Bureau of Land Mgmt.*, 342 F. Supp. 3d 1145 (D. Colo. 2018) ..................................................................................................... 16, 19

**Statutes:**

5 U.S.C. § 701 ................................................................................................................. 1

5 U.S.C. § 704 ................................................................................................................. 1

5 U.S.C. § 705 ........................................................................................................... 25

5 U.S.C. § 706 ...................................................................................................... passim

5 U.S.C. § 2201 ........................................................................................................... 2

5 U.S.C. § 2202 ........................................................................................................... 2

28 U.S.C. § 1331 ........................................................................................................... 1

28 U.S.C. § 1391 ........................................................................................................... 2

42 U.S.C. § 4321 ........................................................................................................... 1

42 U.S.C. § 4332 ................................................................................................... passim

**Regulations:**

40 C.F.R. § 1500.1 ..................................................................................................... 10

40 C.F.R. § 1502.9 ..................................................................................................... 20

40 C.F.R. § 1502.24 .............................................................................................. 19, 20

40 C.F.R. § 1508.7 .............................................................................................. 11, 17

40 C.F.R. § 1508.8 .............................................................................................. 10, 13

40 C.F.R. § 1508.9 ..................................................................................................... 11

40 C.F.R. § 1508.27 ............................................................................................. passim

43 C.F.R. § 46.140 .............................................................................................. 11, 25

Petitioners move the Court for an order for summary judgment under Rule 56, Federal Rules of Civil Procedure and Local Civil Rule 56.1. This Motion is based upon the Complaint and the Memorandum below.

## INTRODUCTION

Petitioners hereby respectfully file this opening brief in support of their Petition for Review of federal agency action. Petitioners respectfully request that this Court declare that Federal Respondents Karen Schroyer and United States Forest Service (collectively "Forest Service") violated the National Environmental Policy Act ("NEPA"), its implementing regulations, and the Administrative Procedure Act ("APA") in analyzing and authorizing the Upper Fryingpan Vegetation Management Project ("Upper Fryingpan Project" or "Project") via an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI"). The Forest Service's refusal to analyze the Project's potential cumulatively significant impacts to climate change and adverse effects on mycelium and forest health, and its failure to prepare an Environmental Impact Statement (EIS), were arbitrary and capricious. As a result of the Forest Service's unreasoned decisionmaking, Petitioners' concrete recreational, economic, and aesthetic interests in the project area have been and will continue to be harmed. Petitioners therefore request that the Court vacate the EA/FONSI and enjoin the Forest Service from implementing the Project, or any part of it, until the agency demonstrates to this Court that it has complied with the law.

## JURISDICTION AND STANDING

1

This Court has jurisdiction pursuant to 28 U.S.C. § 1331. The Forest Service has carried out final agency action that is subject to judicial review under 5 U.S.C. § 704. This cause of action arises under the laws of the United States, including the APA, 5 U.S.C. § 701 et seq., and NEPA, 42 U.S.C. § 4321 et seq. An actual justiciable controversy exists between Petitioners and the Forest Service. This Court has authority to issue declaratory and injunctive relief under 5 U.S.C. §§ 2201, 2202 and 5 U.S.C. §§ 705, 706. Venue is proper in this jurisdiction under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in this judicial district and the property that is the subject of the action is situated in this judicial district. The EA/FONSI was prepared in this judicial district. Administrative Record 5369,[1] 5801. The lands at issue in the Project are in this judicial district. *Id.* In addition, respondent Karen Schroyer carried out her official duties as District Ranger in this judicial district. AR5809.

Petitioners have exhausted their administrative remedies by submitting timely comments on and objecting to the EA /FONSI and the Forest Service's Final Decision. AR3949-950, 4575-621, 5601-629.

Petitioners have standing to challenge the Project EA/FONSI and Final Decision. To establish Article III standing, Petitioners must show that they "have suffered or will imminently suffer a concrete and particularized injury" that is "fairly traceable" to the challenged agency action and is likely to be redressed by a favorable decision. *WildEarth Guardians v. Bureau of Land Mgmt.,* 870 F.3d 1222, 1230 (10th Cir. 2017) (citations omitted).

---

[1] Documents in the Administrative Record are cited to as AR****.

In a NEPA challenge, a plaintiff satisfies the "concrete and particularized injury" requirement by showing that the NEPA violation caused an increased risk of actual, threatened, or imminent environmental harm, and that this increased risk of environmental harm injures the plaintiff's concrete interests due to a "geographical nexus to, or actual use of the site of the agency action." *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 449 (10th Cir. 1996). To establish causation, a plaintiff need only show that the increased risk of harm is fairly traceable to the agency's failure to comply with NEPA and its consequently uninformed decisionmaking. *Id.* at 451.

To demonstrate redressability, a plaintiff "need not establish that the ultimate agency decision would change upon NEPA compliance," as properly informed and reasoned agency decisionmaking would itself redress the harm complained of. *WildEarth Guardians*, 870 F.3d at 1231 (citations omitted). Importantly, "the legal theory and the standing injury need not be linked as long as redressability is met," and "local, non-climate injuries may support standing for a challenge to NEPA climate change analysis." *Id.* A plaintiff "seek[ing] to protect its recreational, aesthetic, and consumptive interests in the land and water" falls "within the 'zone of interests' that [NEPA] was designed to protect." *Comm. to Save Rio Hondo*, 102 F.3d at 449.

Petitioners meet these standards. The Forest Service's unreasoned decisionmaking violated NEPA and has caused an increased risk of environmental harm, injuring the Petitioners' concrete interests in the project area. Petitioners are longtime residents of the Upper Fryingpan Valley (the Valley) who regularly use the project area and surrounding National Forest lands to fish, hike, mountain bike, observe

3

wildlife, and enjoy nature. AR5603-5604. They have built businesses and livelihoods off of tourism and recreation in the area. *Id.* They thus have substantial aesthetic, recreational, personal, and economic interests in the project area through both geographical proximity and actual use.

Petitioners' interests will be irreparably damaged if the Forest Service implements the Upper Fryingpan Project as planned, and these interests are of the sort that NEPA was designed to protect. *See Comm. to Save Rio Hondo*, 102 F.3d at 448. These are actual, concrete, and particularized injuries caused by the Forest Service's failure to comply with NEPA and the APA. A decision requiring the Forest Service to comply with federal law will redress these injuries.

## BACKGROUND

### I.    The Project Area

The proposed Upper Fryingpan Project is located within the Aspen/Sopris Ranger District of the White River National Forest in Eagle County and Pitkin County. AR5802. This biologically diverse area contains a variety of forest cover types, including aspen, blue spruce, cottonwood, Douglas-fir, lodgepole pine, and mixed conifer stands. AR5374. It provides habitat for the Canada lynx, red squirrel, snowshoe hare, goshawk, and elk, as well as diverse flora and fungi species. *See* AR5395-396. Several designated wilderness areas surround the project area: the Mount Massive Wilderness lies directly to its southeast, the Hunter-Fryingpan Wilderness is south and southeast, and the Holy Cross Wilderness Area lies directly east and northeast of the project area. AR5122.

There are several trail systems within the project area, which are used by hikers, campers, rock climbers, mountain bikers, fishers, hunters, horseback riders, and outfitters. AR5480. Twenty-two local outfitters and guides use the Fryingpan Road and trail systems within the Project area. AR5482. Petitioners frequently use the trails, rivers, and roads throughout the project area to run, mountain bike, fish, collect mushrooms, and hike. AR4575-576. Petitioners are concerned that the proposed Upper Fryingpan Project will cause long-term harm to both their immediate recreational and economic interests and to the health of the forest they love.

## II.    Forest Health and Climate Change

Forests provide benefits to the natural environment, as well as economic benefits and ecosystem services to people in the United States and globally. AR2068. The maintenance of healthy forests is essential to slowing anthropogenic climate change: forested areas are cooler than surrounding plains and cropland, and sequester a substantial amount of carbon dioxide, a potent greenhouse gas ("GHG") and primary cause of global climate change. AR2028-029, 2068-069. The warming climate threatens forests' ability to provide wildlife habitat, carbon sequestration, and the economic, recreational, and aesthetic values they have to humans. AR2068. Responsible forest management is, therefore, more crucial than ever.

Mycelium, the vegetative part of a fungus, makes up an important but largely invisible part of the forest ecosystem. Mycelium grows around tree roots and interacts symbiotically with flora, providing host plants with nutrients and increasing resistance to environmental stressors such as drought and root pathogens. AR4579-592. In degraded

landscapes, mycelium helps ensure vegetation reestablishment by fostering nutrient acquisition. *Id.* Mycelium and soil health are also important in carbon sequestration. *See* AR3197-198. "Typically, soil carbon is the largest and most stable carbon pool in forest ecosystems." AR2078.

Clear-cutting harms mycelium and impedes its growth by disturbing the soil and removing the trees that are the organism's primary pathway for nutrient acquisition. AR4751, 4756-757. Mycelium regrows very slowly; since mycelium health is symbiotically linked with above-ground flora, it is unlikely to return to the same level of growth and mycological diversity for a long time after an area is intensively logged. *See* AR4761. This in turn impedes overall forest health, as well as the forest's value as a carbon sink.

Plants and trees remove carbon dioxide—the most significant GHG contributing to climate change—from the atmosphere. The Forest Service estimates that the White River National Forest sequesters 60 tons of carbon per acre in flora and the associated fungal communities. Fed. Resp'ts' Answer to Pet. for Review of Agency Action ¶ 30 (ECF No. 13). Overall, forests offset approximately 11 percent of the United States' carbon dioxide emissions. AR2080. Deforestation and land-use change therefore contribute significantly to climate change. AR2070.

In addition to reducing carbon sequestration, logging and deforestation can also lead to GHG emissions. AR2964. Ground disturbance and the decay of vegetation and mycelium release previously sequestered GHGs:

> Typically, soil carbon is the largest and most stable carbon pool in forest ecosystems … Increased disturbances can … release carbon stored in soils,

6

> especially where multiple disturbances occur at the same time. Although carbon storage may increase in areas where tree growth rates rise, those increases will be small compared to the decreases in storage that occur in response to increasing disturbances in most locations.

AR2068.

Burning forest products for energy production—biomass combustion—releases GHGs and is recognized as a cause of climate change similar to more traditional energy sources (e.g. coal or natural gas). AR3300, 302. While GHG emissions from any one source or project may be individually insignificant, their cumulative impact on climate change is significant. *See WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 77 (D.D.C. 2019) (individual projects may have a de minimis effect on climate change, but agency must consider cumulative impact of GHG emissions). The Forest Service therefore has an affirmative duty under NEPA to analyze and disclose the potential GHG emissions and climate impacts of proposed actions, including the Upper Fryingpan Project.

## III.    The Upper Fryingpan Project

The Project authorizes logging, road construction, and other activities on 1,631 acres of National Forest land, the majority of which will be clear cut. AR5805-5806. The cut trees will be removed for use as forest products and/or biomass fuel. AR5805. The logging waste, known as "slash," will either be piled and burned, lopped and scattered, or removed for biomass energy generation. *Id.* The Forest Service has identified "[p]rovid[ing] commercial forest products and/or biomass to local industries" as the Project's primary purpose. AR5804.

The Project will have significant adverse effects on Petitioners and other residents of the Fryingpan Valley, who have concrete recreational, aesthetic, and

7

economic interests in the project area. They hike, bike, swim, and hunt mushrooms in the project area. AR3949, 4575-576. They depend on income from tourists visiting for outdoor recreation. AR4575-576. All of these recreational activities and interests would be impaired for many years. In the Forest Service's best-case scenario, forest regrowth would take up to a century; trees would "likely be in a seedlings structural stage" for 40 years and would not reach maturity until 80 to 100 years after the timber harvest. AR5404. The Forest Service justifies its finding of no significant impact on the grounds that "[b]ecause vegetation grows back over time, timber harvesting activities would not cause irreversible impacts." AR5519. This assertion shows a fundamental misunderstanding of "irreversible impacts,"[2] and is of little comfort to the residents and visitors, most of whom will never see the mature stands.

The Upper Fryingpan Project will also kill important mycelium in the project area, adversely impacting forest health and eliminating a popular recreational use of the forest. *See* AR4576, 4727. Regeneration of mycelium in the Upper Fryingpan Project area could take decades, as the trees on which mycelium depend would take up to a

---

[2] The EA's discussion of "Irreversible and Irretrievable Commitment of Resources" states, in its entirety, that "*Given time, all actions within this alternative are reversible.* Forested vegetation is a renewable resource and can be managed for many desired attributes and changes to the forested landscape.  Treatment of the forest vegetation is not an irreversible or irretrievable commitment of the resource.  *Because vegetation grows back over time, timber harvesting activities would not cause irreversible impacts.* Actions such as road building and other activities associated with timber harvest in most cases would be viewed as a permanent action on the landscape although the effects would be lessened over time when roads are decommissioned." *Id.* (emphasis added). Since all actions are arguably "reversible" given enough time, this is a meaningless statement. The Forest Service also fails to elaborate on why "road building and other activities" should not, in this case, be viewed as a permanent action. *See id.*

century to regrow. AR4719, 4761 (mycelium depend on established trees, will regrow in tandem with forest recovery); AR5405 (regrowth will take 80 to 100 years).

In addition to the potentially adverse effects of the Project on forest health and the mycological community, the Project would result in GHG emissions that would have a reasonably foreseeable, significant impact on climate change. *See* AR4637-638.[3] The project area would lose its effectiveness as a carbon sink. *See* AR1904 ("human activities, especially emissions of [GHGs] from … deforestation … are primarily responsible for [ ] climate change[ ]."). Further, the primary purpose of the Project— supplying forest products for biomass combustion—would result in GHG emissions and contribute to cumulatively significant climate impacts. AR3300 (climate change is due to human activities including burning biomass). In sum, the Forest Service's plan to remove approximately 1,631 acres from the White River National Forest will exacerbate climate change through the elimination of a large carbon sink and GHG emissions from project activities and biomass combustion. Petitioners have repeatedly expressed their concern about these and a host of related issues throughout the development of the project proposal.

The Forest Service initiated its scoping process for the Upper Fryingpan Project on October 6, 2016. AR3374. Only two alternatives were considered—the "no action" alternative, and the Forest Service's "preferred alternative." AR3384. Petitioners submitted timely comments on the draft EA to express their opposition to the project.

---

[3] As discussed below, the Forest Service concedes that the Project would result in GHG emissions but denies, without further explanation, that this would have a cumulative impact on climate change. *Id.*

AR4575- 4621. The final EA/FONSI, proposing to adopt the Forest Service's preferred alternative, were released in December 2017. Petitioners filed timely objections to the final EA/FONSI reiterating their objection to the project. AR5601- 5629. The Forest Service responded to Petitioners' objections on April 19, 2018, finding that the objections lacked merit. AR5744. On April 30, 2018, the Forest Service released its Final Decision Notice, authorizing the implementation of the Upper Fryingpan Project. AR5809.

Petitioners, having exhausted their administrative remedies, filed this complaint to protect their concrete and procedural interests in the Forest Service's decision. As set forth below, the Forest Service failed in its obligations under NEPA to consider the Project's significant environmental effects.

## IV.    The National Environmental Policy Act

NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action [and] ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (citations omitted).

A federal agency must prepare an environmental impact statement ("EIS") when a proposed major federal action may significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). The EIS should analyze any potentially significant direct, indirect, or cumulative impacts of the agency's proposed action. *Id.* § 1508.27(b).

10

Indirect impacts are "caused by the action and are later in time or farther removed in distance but still reasonably foreseeable." *Id.* § 1508.8. Cumulative impacts result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions … Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

An agency may choose to prepare an environmental assessment ("EA") to "briefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact." *Id.* § 1508.9(a)(1). It is not a tool to circumvent proper NEPA analysis. "If an agency decides not to prepare an EIS, it must supply a 'convincing statement of reasons' to explain why a project's impacts are insignificant." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (citations omitted). "The statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project." *Id.*; *see also Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).

Where an EA reveals that a proposed action will have significant potential effects, the agency must prepare a full EIS. 42 U.S.C. § 4332; *see also Kleppe*, 427 U.S. at 410 n.21. A site-specific EA "can be tiered to a … broader- scope [EIS] … for a proposed action with significant effects, whether direct, indirect, or cumulative, if … [the EIS] fully analyzed those significant effects." 43 C.F.R. § 46.140. However, if the impacts analysis in the EIS is not "sufficiently comprehensive" the EA must explain this and provide additional analysis. *Id.*

NEPA's "procedural requirements are not merely formalities." *Dine Citizens Against Ruining our Env't v. Klein*, 747 F. Supp. 2d 1234, 1248 (D. Colo. 2010). They are integral to its purpose, and failure to follow those procedures is arbitrary and capricious under the APA. *See* 5 U.S.C. § 706 (2)(A). Thus, a reviewing court must set aside agency action taken without "the necessary process by which agencies must take a 'hard look' at [its] environmental consequences." *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1034 (10th Cir. 2001) (citations omitted).

## STANDARD OF REVIEW

The APA governs judicial review of agency action under NEPA. 5 U.S.C. § 706. Under the APA, "the reviewing court shall… hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706 (2)(A); *see also WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1182-83 (10th Cir. 2013). For its determination to survive review under the arbitrary and capricious standard, "an agency must examine the relevant data and articulate a rational connection between the facts found and the decision made." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 713 (10th Cir. 2009) (citations omitted). The arbitrary and capricious standard is deferential, but it does not "shield" agency decisions from a "searching and careful," "thorough, probing, and in-depth review." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).

Agency action must be set aside as arbitrary and capricious if

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem,

offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In addition to considering the appropriate factors, an agency must be able to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* An agency must adequately justify its conclusions based on the evidence in the administrative record—courts will not "defer to a void." *New Mexico ex rel. Richardson*, 565 F.3d at 715.

## ARGUMENT

**I.     The Forest Service's refusal to discuss foreseeable greenhouse gas emissions or impacts on climate change was arbitrary and capricious.**

The Forest Service's refusal to consider or disclose reasonably foreseeable GHG emissions or potential climate impacts from the Project violated NEPA and defied relevant precedent. Because the Forest Service failed to consider a significant aspect of the issue, and did not adequately analyze reasonably foreseeable indirect and cumulative effects of the Project, this Court should set aside its decision as arbitrary and capricious.

### a.  The Forest Service failed to consider the reasonably foreseeable climate impacts of clearcutting and biomass combustion.

The Upper Fryingpan Project EA/FONSI is inadequate under NEPA, which requires an agency to consider and disclose all reasonably foreseeable indirect and cumulative effects of its proposed actions. 40 C.F.R. §§ 1508.8, 1508.27(b). Here, the Forest Service conceded that the Project would produce GHG emissions, which have

cumulative impacts on climate change, but refused to consider these effects. AR4637-38. This violated its statutory duties to "consider every significant aspect of the environmental impact of a proposed action" and to "inform the public that it has indeed considered environmental concerns in its decisionmaking process." *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 690 (10th Cir. 2015).

The primary purpose[4] of the Project is to "[p]rovide commercial forest products and/or biomass to local industries," AR5375, which the Forest Service concedes will result in GHG emissions. AR4637-38. To accomplish this purpose, the Forest Service plans to "treat" over 1,600 acres of National Forest, the majority of it through clearcutting. AR5805-806. This will damage fungal communities, soil and ecosystem health, and the forest's ability to sequester carbon. *See* AR2078. Transporting forest products to mills and biomass facilities will produce GHG emissions. *See* AR5484.[5] The combustion of biomass to produce energy—one of the Project's primary purposes—will produce GHG emissions. *See* AR3300. The Project will directly and indirectly produce

---

[4] The EA contains two further Project purposes: "Increase tree age/size class diversity at the stand and landscape scales, thereby increasing forest resistance and resilience to disturbances, such as future bark beetle outbreaks, fires, and other climate-related mortality events" and "Provide snowshoe hare habitat …" AR5375. While not at issue here, Petitioners do not concede that the Project would have these positive impacts. The Forest Service, in its "Preliminary Assessment and Management Recommendations" document, also concluded that "Regulated timber production within these areas is not considered to be compatible with their desired conditions and objectives." It justified the removal of forest products to offset the costs of ecologically desirable treatments. AR3361.

[5] "Log trucks would be on NFSR 400 approximately 390-520 days … with approximately 10 loads a day … on NFSR 506 approximately 240-320 days … with approximately 10 loads a day … on [and] on Fryingpan Road … approximately 70-93 days … with 10 loads a day." AR5484. This does not include transportation of personnel and machinery to and from the project area.

GHG emissions and have significant cumulative climate impacts. In violation of its duties under NEPA, the Forest Service has refused to analyze or discuss these direct, indirect, and cumulative effects, and has provided no explanation for its failure to do so.

### b. The Forest Service failed to reasonably explain its refusal to consider GHG emissions and climate impacts.

After failing to consider the Project's potential GHG emissions or climate impacts, the Forest Service responded to Petitioners' concerns by asserting, without support in the record or legal precedent, that it did not need to analyze these effects. AR4637-38. This was inadequate under NEPA and this Court's precedent. *See* 40 C.F.R. § 1508.27; *Citizens for a Healthy Cmty. v. Bureau of Land Mgmt.*, 377 F. Supp. 3d 1223, 1237 (D. Colo. 2019).

The Forest Service offers three explanations for its failure to analyze GHG emissions or climate impacts: that the Council on Environmental Quality has withdrawn its guidance on climate change analysis; that the expected (although unquantified or analyzed) emissions would have "little bearing on climate change"; and that the Forest Service is unable to compare emissions from biomass generators to emissions from "traditional energy sources." AR4637-38. None of these assertions adequately support the agency's omission.

Courts have routinely required agencies to analyze and disclose proposed actions' GHG emissions and climate impacts during the NEPA process, and the CEQ's withdrawal of its formal guidelines for this process has no impact on the Forest Service's NEPA obligations. *See, e.g.*, *WildEarth Guardians*, 368 F. Supp. 3d at 79. (agency should try to quantify effects of GHG emissions); *WildEarth Guardians*, 870

15

F.3d at 1235 (agency's faulty analysis of increased GHG levels from project violated NEPA); *Citizens for a Healthy Cmty.*, 377 F. Supp. 3d at 1237 (agency must quantify and analyze the foreseeable indirect effects of emissions); *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1190 (D. Colo. 2014) (reliance on general discussion of climate change was inadequately supported and violated NEPA). This includes reasonably foreseeable "downstream" emissions, such as GHGs produced by the eventual combustion of resources extracted from public lands, as well as the cumulative climate impact of those emissions. *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008) ("The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct."); *Wilderness Workshop v. Bureau of Land Mgmt.*, 342 F. Supp. 3d 1145, 1156 (D. Colo. 2018) (agency must consider indirect effects of combustion of fossil fuels). These obligations are imposed by the clear text of NEPA and its implementing regulations.

In recognition of this requirement, the Council on Environmental Quality (CEQ) released its 2016 Final Guidance on Consideration of Greenhouse Gas Emissions to "facilitate compliance with existing NEPA requirements, thereby improving the efficiency and consistency of reviews." CEQ, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews 1 (Aug. 1, 2016). It did not create the agency obligation to analyze indirect and cumulative effects; as explained above, that was imposed by NEPA. Similarly, the CEQ's later withdrawal of the guidance

16

document, AR4637, did not nullify agencies' duty to disclose indirect and cumulative effects, and the Forest Service is not free to shirk its statutory obligations.

The Forest Service next dismisses the Project's potential climate impact as negligible and not worth quantifying or discussing. AR4637-38. This ignores the agency's duty to consider cumulative impacts and is unsupported by the record. Under NEPA, the Forest Service has a duty to take a hard look at the proposed action's cumulative effects, which "result[ ] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions" and "can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. While the Project's individual climate impacts may be minor, "[i]t is the broader, significant 'cumulative impact' which must be considered by an agency, but which was not considered in this case." *San Juan Citizens All. v. Bureau of Land Mgmt.*, 326 F. Supp. 3d 1227, 1248 (D.N.M. 2018).

Moreover, it is impossible to determine from the record how significant the Project's GHG emissions and climate impact might be, because the Forest Service did nothing to calculate them. Its unsupported assertion that "emissions from the proposed action are expected to be of such small scale that they would have little bearing on climate change" was made in response to Petitioners' comments—the Notice of Proposed Action and EA/FONSI are devoid of any reference to GHG emissions or potential climate impacts,[6] as is the 2004 NFP to which the EA is tiered. AR4637. The

---

[6] Although it repeatedly uses climate change to justify Project actions. The Forest Service argues that clear cutting is necessary to improve climate-change resilience in

Forest Service offers no support for its conclusions. "Without further explanation, the facile conclusion that this particular impact is minor and therefore would not produce climate change impacts … is insufficient to comply with Section 1508.7." *San Juan Citizens All.*, 326 F. Supp. 3d at 1248 (citing *Ctr. for Biological Diversity*, 538 F.3d at 1217). A general, conclusory statement that there will be no cumulative effects is inadequate, and gives a reviewing court nothing on which to base a review. While agencies receive deference to decisions based on their technical expertise, courts "cannot defer to a void." *New Mexico ex rel. Richardson*, 565 F.3d at 715; *see also WildEarth Guardians*, 870 F.3d at 1238 (agencies cannot rely on expertise deference doctrine where "there is nothing to defer to.").

Finally, the Forest Service states that it "does not have the ability to measure the amount of emissions released during the mining, transport, and refinement of traditional materials used for electricity, such as coal, natural gas, and hydroelectric projects" and therefore could not meaningfully contextualize biomass emissions were it to calculate them. AR4637-38. This claim undermines the agency's previous assertion that "[w]hen compared to the amount of emissions released at local or regional scales, emissions from the proposed action are expected to be of such small scale that they would have little bearing on climate change." *Id.* The Forest Service cannot make a factual claim

---

aspen stands, AR5413, 416, but does not acknowledge the potential climate impacts of Project actions. This is itself arbitrary and capricious. *See High Country Conservation Advocates*, 52 F. Supp. 3d at 1191 (agency choosing to "trumpet" an action's benefits has a duty to disclose its costs).

about emissions levels and then, in the next sentence, argue that it is unable to make any such statement—and indeed, it fails to provide any basis for its claims.

Federal agencies have routinely analyzed GHG emissions from and potential climate impacts of coal- and natural-gas-extraction projects; indeed, courts in this circuit have required them to do so. *See, e.g.*, *WildEarth Guardians*, 870 F.3d at 1228 (agency must adequately support coal-emissions estimates); *Wilderness Workshop*, 342 F. Supp. 3d at 1156 (agency must measure and discuss emissions from natural gas even if likely lower than coal-emissions); *High Country Conservation Advocates*, 52 F. Supp. 3d at 1195-96 (agency must measure emissions from coal). The Forest Service fails to explain why existing data produced by federal agencies could not provide context, or why the Project should be exempt from this requirement.

Courts routinely require agencies to consider and disclose reasonably foreseeable GHG emissions and climate impacts during the NEPA process. In refusing to do so, the Forest Service ignored a relevant aspect of the problem and failed to adequately support its decision with reference to the record before it. This Court should set aside its decision as arbitrary and capricious.

**II.    The Forest Service failed to adequately consider the Project's likely impact on mycelium.**

The Forest Service did not address evidence on the adverse effects of clearcutting on the mycological community and the importance of mycorrhizae to forest health and regeneration. While the Forest Service notes that "there may be less fungal activity in 10 years after clearcut," AR5456, it did not explain the crucial importance of mycelium to forest health. It also failed to address opposing viewpoints on the likely

impacts of the Project, including those reached by its own sources. The Forest Service therefore failed to "insure scientific integrity," 40 C.F.R. § 1502.24, and reached a decision that ran "counter to the evidence before" it, see *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

When reviewing an agency's NEPA compliance, a court must ensure that the EA or EIS "contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision." *All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1445 (10th Cir. 1992) (quoting *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C.Cir.1988)). The regulations implementing NEPA require the Forest Service to carry out its duties with scientific accuracy. 40 C.F.R. § 1502.24. To ensure scientific integrity, the Forest Service must discuss opposing views in its EA/FONSI, including scientific studies averse to its own analysis. *Id.* §§ 1502.9, 1502.24. Here, the EA contains virtually no discussion of the relevant issues or opposing evidence related to mycological health. *See* AR5456.

"Fungi play a central role in many microbiological and ecological processes," AR4603, but the Forest Service's cursory analysis of the Project's likely impact on fungi did not discuss the significance of mycorrhizae or the consequences of decreased fungal activity. *See* AR5456, 5749-50. Although multiple resources in the record emphasize the importance of mycorrhizae (*see, e.g.*, AR4579, 4603, 4613, 4728), the Forest Service disregarded this issue in the EA/FONSI.

The Forest Service also failed to consider evidence of clearcutting's adverse impacts on mycological health. Studies, including those before the Forest Service while preparing the EA/FONSI, have found that clearcutting "resulted in a dramatic decline in fine root activity and a similar reduction in the diversity of mycorrhizae two growing seasons after logging and a virtual elimination after 3 years." AR4735, 4756. While "small scale disturbances" such as "root disruption caused by burrowing animals" or "microarthropod grazing" increased mycorrhizae diversity, larger disturbances resulted in *lower* mycological richness and diversity. *See* AR4721, AR5750. Finally, several researchers suggested that clearcutting might impede the regeneration of the mycological community. AR4719, 4727, 4735.[7] The Forest Service addressed none of this opposing information.

The Forest Service failed to adequately support or articulate a rationale for the conclusions in the EA/FONSI regarding the potential impact on mycological health. While an agency is entitled to rely on its own experts, *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1057 (10th Cir. 2011), the expert reports cited by the Forest Service do not adequately support the agency's conclusions, which ran "counter to the evidence before" it. *See State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

The Forest Service's sources suggest that large-scale disruption of the sort contemplated in the EA/FONSI would be detrimental to mycorrhizae and, therefore, forest health more broadly. AR4756. While the Forest Service does not claim that there

---

[7] Most of the planned clearcuts would be over 25 acres, the area at which mycorrhizal diversity was impacted. AR4735, 5805-806.

would be no damage to the mycological community, it implies that any negative effects would be minor and short term. AR5749-50. This is not supported by the record.[8] The Forest Service's claim that adversely affected areas would easily regenerate because "fungal [spores] are effectively dispersed by wind, and allow ready colonization of available habitat," AR5749-50, was explicitly refuted by the research it cited. One study found that "[l]ate-stage fungi appear to establish with great difficulty by spores," AR4719; another concluded that

> clear-cut logging has the potential to reduce the amount and diversity of inoculum by reducing the persistence of ectomycorrhizae. Over time, other types of inoculum, such as spores, will disperse into disturbed areas, but their overall contribution to the inoculum potential of these soils is thought to be low.

AR4727. The Forest Service's conclusion, which cites no other support in the record, ran directly counter to the evidence before the agency.

The Forest Service states that "typically, disturbance results in an increase in fungal biomass and diversity," AR5749, without clarifying that only small-scale, natural disturbances—such as those created by burrowing animals, microarthropod grazing, and animal droppings—have this beneficial effect. AR4716. As Forest Service's sources

---

[8] More broadly, the studies cited by the Forest Service—which, again, do not generally support its assertions—are of questionable relevance to the project area. Only two of the sources are from the United States.  Two studies from British Columbia found that clearcutting had a "profound effect" on fungal communities. AR4751. One report examined eucalyptus forests and Australian heathland. AR4719. Another studied changes in a "semi-natural" grassland in northern Denmark, AR4767, and the final study was of "subxeric, mesic and herb-rich forests and spruce mires in northern Finland." AR4739. Even if the evidence on the record supported the Forest Service's overall conclusions, which it does not, the relevance of these studies would be questionable.

conclude, disturbances on the scale of the Project typically result in a *decrease* of fungal biomass and diversity. AR5750.

Because the Forest Service failed to disclose the importance of mycorrhizal health, did not address opposing evidence on the adverse effects of clearcutting on mycorrhizae, and "offered an explanation that runs counter to the evidence before" it, *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43, its decision should be set aside as arbitrary and capricious. *See* 5 U.S.C. § 706 (2)(A).

### III.    The Forest Service failed to prepare an EIS as required by NEPA.

The Upper Fryingpan Project will have a significant impact on the environment. NEPA requires an agency to prepare an EIS when a proposed major federal action may significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). Thus, the Forest Service is required to prepare an EIS before proceeding with the Project.

To determine whether a project may have a significant effect, the agency must look to its context and intensity. 40 C.F.R. § 1508.27. Intensity depends on factors including: the degree to which the proposed action is highly controversial, the degree to which the action represents a decision in principle about a future considerations, and whether the action is related to other actions with individually insignificant but cumulatively significant impacts. *Id.* "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." *Id.*

The Project implicates several of the factors discussed above. Reasonably foreseeable impacts include increased GHG emissions and cumulative climate impacts (AR4637-38); damage to the mycological community and soil health (AR5456); and

negative effects on tourism and recreation (AR4575-576), which have also made the Project controversial among area residents and visitors (AR5603-604). The Forest Service failed to adequately analyze these effects and arbitrarily refused to consider—or even mention—GHG emissions and climate impacts. This could set a troubling new precedent. Without court action, the Forest Service is free to approve and implement further projects without properly considering climate change and significant ecological effects. Finally, "[t]he impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." *Ctr. for Biological Diversity*, 538 F.3d at 1217. Individually and cumulatively, these factors should compel the Forest Service to prepare an EIS.

### a. The Project will have indirect and cumulatively significant effects.

The Project's implementation would lead to cumulatively significant GHG emissions and effects on climate change, "the most pressing environmental challenge of our time." *See Massachusetts v. E.P.A.*, 549 U.S. 497, 505 (2007). It would also cause potentially significant damage to mycelium, which is integral to soil and forest health. AR4603. An adequate cumulative-effects analysis is particularly crucial here, as much of the area surrounding the Project has recently been logged. *See* AR5403-404. An EIS should be developed to adequately analyze and disclose these issues, which the EA/FONSI failed to do.

The Project also warrants an EIS because it is related to other actions with individually insignificant but cumulatively significant impacts. 40 C.F.R. § 1508.27. "Significance exists if it is reasonable to anticipate a cumulatively significant impact on

24

the environment." *Id.* As the Forest Service has conceded that the Project will lead to GHG emissions, it is "reasonable" to anticipate cumulatively significant climate impacts. *See id.* In support of its refusal to analyze these issues, the Forest Service offered only a brief, conclusory statement that the Project would have no significant impact on climate change. AR AR4637-38. This was inadequate under NEPA: "A proper consideration of the cumulative impacts of a project requires 'some quantified or detailed information; … [g]eneral statements about possible effects … do not constitute a hard look absent a justification regarding why more definitive information could not be provided.'" *Klamath-Sikiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993-94 (9th Cir. 2004) (internal citation omitted).  The Forest Service's failure to prepare an EIS was therefore a violation of NEPA. *See* 42 U.S.C. § 4332(c).

The Project's cumulative climate impacts have not been previously analyzed on any relevant scale. An EA prepared in support of a proposed action with significant effects may be tiered to an EIS "if the broader EIS fully analyzed those significant effects." 43 C.F.R. § 46.140(c); *see also Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 856 (10th Cir. 2019), *reh'g denied* (June 24, 2019). However, "[t]o the extent that any relevant analysis in the broader NEPA document is not sufficiently comprehensive or adequate to support further decisions, the tiered NEPA document must explain this and provide any necessary analysis." 43 C.F.R. § 46.140(b).

Here, the Forest Service cannot rely on a broader EIS to justify its failure to analyze climate change. The Forest Plan Final Environmental Impact Statement to

which the EA is tiered has no discussion of GHG emissions or climate impacts.

(AR5521). If the Forest Service dismisses the effects of specific projects as insignificant

without addressing climate change at a more programmatic level, the impacts will

forever escape analysis. This is precisely the evil that NEPA's cumulative-effects-

analysis requirement is meant to avoid. *See Thomas v. Peterson*, 753 F.2d 754, 759

(9th Cir. 1985). The Project's significant cumulative effects mandate the preparation of

an EIS. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.27.

**b. The Project has been highly controversial among area residents, and there is a substantial dispute as to the effect of the action.**

The Upper Fryingpan Project's effects are both uncertain and highly

controversial. NEPA requires that an EIS be prepared when the effects of federal action

are "highly controversial" or "highly uncertain or involve unique or unknown risks" 40

C.F.R. § 1508.27(b). The Project proposal has sparked considerable controversy

amongst residents and visitors that recreate in or economically depend on the area. *See*

AR3431-935 (non-plaintiff comments). In addition, the Forest Service has flatly denied

that the Project will have substantial cumulative impacts on climate change, AR4637-

638, and failed to discuss the significance of potential damage to the area's mycological

community, *see* AR4640-641. The Project's effects are, therefore, uncertain precisely

because of the Forest Service's inadequate analysis. Due to its controversial nature and

the uncertainty caused by the Forest Service's failure to comply with NEPA, the refusal

to prepare an EIS was arbitrary and capricious. *See* 5 U.S.C. § 706 (2)(A); 40 C.F.R. §

1508.27(b).

As Petitioners have stated in their comments and objections to the Project, the Forest Service's proposed action would gravely impact the recreational, aesthetic, and economic interests of valley residents. AR 4575-577, 5621-629. Numerous valley residents commented on the proposal, many of them expressing concerns over the Project's potential to impair their recreational use of the project area. S*ee, e.g.,* AR3431-437, 3446-449, 3451-452, 3457, 3469, 3476, 3485, 3489, 3491-931 (non-plaintiff comments on recreation-impact concerns). Others noted potential safety issues from logging traffic. AR3433-434, 3437-439, 3452-458, 3464, 3469-470, 3476, 3478-482, 3485 (non-plaintiff comments on safety). Representatives from Pitkin County (AR3450-452), Eagle County (AR3478-479), the Town of Eagle (AR3480-481), and the Town of Basalt (AR3487-490, 3932-933) also submitted comments on a wide range of issues. Clearly the Project has inspired controversy in the communities throughout the area. The Forest Service, which has the duty to fully inform the public of the potential environmental effects of its proposed actions, should prepare a full and adequate analysis of the Project, as required by NEPA, to more fully address the affected communities' concerns. *See* 40 C.F.R. § 1508.27(b).

The Forest Service's inadequate analysis also leaves considerable uncertainty about the Project's effects that should be addressed in an EIS. "Even in the absence of substantial public opposition, an action may be 'highly controversial' if there is a substantial dispute as to the size, nature, or effect of the action. *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1263 (10th Cir. 2019) (citations omitted).  An agency proposal warrants an EIS where there is "a substantial dispute as to the … effect of the action."

*Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002). Such a dispute exists here. The Forest Service denies that the Project would cause significant damage to mycelium, and simply refuses to consider potential climate impacts. AR4637-641. A high level of uncertainty as to the Project's effects persists largely because the Forest Service has failed to provide any support for these assertions. An EIS is warranted "where uncertainty may be resolved by further collection of data." *Town of Superior v. U.S. Fish and Wildlife Serv.*, 913 F. Supp. 2d 1087, 1120 (D. Colo. 2012). Here, where the agency has done only minimal data collection—and, on potential GHG emissions and climate impacts, no data collection at all—an EIS would be appropriate. *See* 40 C.F.R. § 1508.27(b).

### c. The Forest Service's refusal to discuss climate impacts represents a decision in principle about future considerations.

The Forest Service's refusal to discuss GHG emissions or climate impacts, which runs contrary to both NEPA and this Court's precedent, may signal a "decision in principle" about the agency's position on future projects. *See* 40 C.F.R. § 1508.27(b). For this reason alone the Court should require a full NEPA analysis. *See id.*

The Forest Service based its refusal to consider climate impacts on a change in administrative guidance rather than information specific to the project, AR AR4637-38, thus signaling a decision in principle on its NEPA policy. This was in error. While the CEQ has withdrawn its official guidance on climate-impact analysis, AR1842-843, this does not change the Forest Service's obligations under NEPA. *Id.* ("The withdrawal of the guidance does not change any law, regulation, or other legally binding requirement."). *See also Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015)

(interpretive rules do not have power of law). Agencies are legally required to consider and disclose potentially significant cumulative effects, including GHG emissions and climate impacts, under NEPA. 40 C.F.R. § 1508.27. *See also WildEarth Guardians*, 870 F.3d at 1235 (agency's faulty analysis of increased GHG levels from project violated NEPA); *Citizens for a Healthy Cmty.,* 377 F. Supp. 3d at 1237  (agency must quantify and analyze the foreseeable indirect effects of emissions).

The Forest Service did not attempt to articulate a rational explanation for why it does not consider the Project's potential climate impacts cumulatively significant—it simply refused to address the issue. AR AR4637-38. If this approach represents a decision in principle about the Forest Service's position on GHG emissions and climate change impacts, the Forest Service should prepare a full EIS. It will otherwise be free to neglect its obligations in future NEPA analyses.

If a plaintiff in a NEPA case raises substantial questions regarding whether a project may have a significant effect on the environment, "a decision not to prepare an EIS is unreasonable." 42 U.S.C. § 4332(2)(C); *Blue Mountains Biodiversity Project*, 161 F.3d at 1211. Here, the Forest Service determined that the Project "will not have a significant effect on the quality of the human environment" despite the several factors suggesting that the Project may have significant indirect and cumulative effects. An EIS is required before the Forest Service may implement the Upper Fryingpan Project, and the EA/FONSI is arbitrary and capricious. 5 U.S.C. § 706 (2)(A).

## CONCLUSION AND REQUEST FOR RELIEF

Under the APA, courts "shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious ... or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The appropriate remedy is to vacate unlawful agency action and remand the issue to the agency with instructions to comply with its legal obligations under NEPA. *Center for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1240 (D. Colo. 2011) ("when a rule has been found to be legally invalid, the ordinary result is vacatur"), *citing Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998).

Accordingly, Petitioners respectfully request that this court (1) declare that the Upper Fryingpan Vegetation Management Project EA/FONSI and Final Decision violate NEPA; (2) vacate and remand the Project EA/FONSI and Final Decision; and (3) enjoin the Forest Service from proceeding with the Project, or any portion thereof, unless and until the it has corrected these violations to the satisfaction of this Court.

Respectfully submitted and dated October 28, 2019.

/s/    John Swomley (BBO#551450)
Swomley & Tennen, LLP
50 Congress Street, Suite 600
Boston, MA 02109
Ph. (617) 227-9443
Fax (617) 227-8059
jswomley@swomleyandtennen.com
Attorney for Petitioners

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Colorado by using the Court's CM/ECF system on October 28, 2019. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the District Court's CM/ECF system. The Court's CM/ECF system will send electronic notification of this filling to the following individuals:

Hayley A. Carpenter – hayley.carpenter@usdoj.gov

John Swomley – jswomley@swomleyandtennen.com

_/s/_    John Swomley (BBO#551450)
Swomley & Tennen, LLP
50 Congress Street, Suite 600
Boston, MA 02109
Ph. (617) 227-9443
Fax (617) 227-8059
jswomley@swomleyandtennen.com
Attorney for Petitioners

**CERTIFICATE OF WORD COUNT**

As required by D.C.COLO.LPtR 17, I certify that the document contains 8,947 words.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on October 28, 2019

<u>/s/</u>    John Swomley (BBO#551450)
Swomley & Tennen, LLP
50 Congress Street, Suite 600
Boston, MA 02109
Ph. (617) 227-9443
Fax (617) 227-8059
jswomley@swomleyandtennen.com
Attorney for Petitioners