UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01055-TMT

JOHN SWOMLEY, TODD BARKER, DAVID GOLDSTEIN, ELIZABETH
SWOMLEY, OLIVIA SWOMLEY, JAMES SWOMLEY, SARAH SWOMLEY,
ROBERT COSINUKE, WILLA COSINUKE, JENNIFER KRIER, ABIGAYLE
COSINUKE, AUGUST COSINUKE, KATHRYN VAGNEUR, BRUCE
BARKER, GERRY BARKER, TOM STEWART, BARBARA STEWART,
THOMAS H. STEWART, KATHERINE KENNEY, ERIC VOTH, MICHELLE
VOTH,

    Petitioners,

v.

KAREN SCHROYER, in her official capacity as District Ranger, Aspen-Sopris
Ranger District, White River National Forest, United States Forest Service, and
UNITED STATES FOREST SERVICE, a federal agency of the United States
Department of Agriculture,

    Federal Respondents.

---

**MEMORANDUM OPINION AND ORDER**

---

This matter comes before this court on Petitioners' "Petition for Review of Agency

Action." (Doc. 1.) In the Petition, 21 residents of the Upper Fryingpan Valley near

Leadville, Colorado (collectively Petitioners) challenge the U.S. Forest Service's

approval of the Upper Fryingpan Project—a timber project in a section of the White River

National Forest.

Petitioners bring three claims under the National Environmental Policy Act

(NEPA) and the Administrative Procedure Act (APA). Petitioners allege the Forest

Service[1] violated these statutes by (1) failing to consider the Project's impact on climate change; (2) failing to adequately consider scientific evidence regarding the Project's impact on fungi; and (3) failing to prepare an environmental impact statement (EIS) for the Project.  After careful review of the parties' briefing and the administrative record,[2] this court holds Petitioners have failed to establish any violations under NEPA or the APA.  Thus, for the reasons stated below, this court denies the Petition and grants judgment in favor of the Forest Service on all counts.

## I.  Background

This matter arises from the Forest Service's approval of the Upper Fryingpan Project.  The Project authorizes logging on 1,631 acres of land in the White River National Forest.[3]  Specifically, the Project is located in the Upper Fryingpan Valley and covers numerous unconnected segments of forest roughly in between Leadville, Colorado and the Reudi Reservoir.  (*See* Doc. 26 at 3.)   Petitioners regularly use the valley,

---

[1]  Petitioners also name Karen Schroyer—the Forest Service district ranger for the relevant area—as a respondent.  For convenience and because Schroyer is only sued in her official capacity, this court refers here to all respondents collectively as "the Forest Service."

[2]  The Forest Service lodged the Administrative Record with the court.  (Doc. 16.)  This court refers to the Administrative Record herein by citing to AR-XXXX.

[3]  To effectuate the logging, the Project also authorizes the construction of nine miles of new roads and necessarily will result in increased traffic on certain existing roads.

including the Project area, to fish, hike, swim, mountain bike, hunt mushrooms, observe wildlife, and "enjoy nature."[4]  (Doc. 22 at 3, 7.)

The forest in the Project area is composed of lodgepole pine, aspen, and mixed conifer species.  Of the 1,631 acres, the Forest Service plans to treat 1,061 acres with a "clearcut with leave tree" method.  This approach harvests all lodgepole pine over five inches in diameter, but leaves aspen and mixed conifer species on the landscape.  Another 198 acres will be treated through a "coppice" method, which involves harvesting all merchantable trees (typically those over five inches in diameter) and felling or burning all nonmerchantable trees.  The remaining 369.6 acres[5] will be treated through a "group selection" method, which "create[s] small openings, a quarter acre to an acre in size."  AR5386.  These openings would not collectively exceed 25% to 30% of the acreage treated with this method.

Generally, the harvested trees will be removed for use as forest products and biomass fuel.  The waste resulting from the logging—known as "slash"—will be piled and burned; lopped and scattered; or removed for biomass energy generation.

---

[4]  Petitioners allege additional interests in the land at issue.  (*See* Docs. 1, 22.) These need not be recounted here as this court holds the listed interests sufficient to establish standing, *see WildEarth Guardians v. Bureau of Land Mgmt.*, 870 F.3d 1222, 1230 (10th Cir. 2017) (requiring Petitioners show they "have suffered or will imminently suffer a concrete and particularized injury" that is "fairly traceable" to the challenged action), and the Forest Service does not challenge the justiciability of Petitioners' suit.

[5]  Under this breakdown of acreage, 2.4 acres remain unaccounted for.  It is not clear from the record or briefing what, if any, treatment would occur in this area, but this court finds the type of treatment, if any, immaterial.

The Forest Service identifies three purposes for the Project: (1) providing commercial forest products and biomass to local industries; (2) increasing the "tree age/size class diversity at the stand and landscape scales, thereby increasing forest resistance and resilience to disturbances, such as future bark beetle outbreaks, fires, and other climate-related mortality events"; and (3) providing "snowshoe hare habitat in both the stand initiation structural stage and in mature, multi-story conifer vegetation to benefit the Canada lynx, a federally threatened species." AR5375–76.

Approval for the Project began on October 6, 2016, when the Forest Service first initiated a scoping process. Two alternatives were considered: (1) the "no action" alternative, and (2) the "preferred alternative" of moving forward with the Project. AR3384. The Forest Service received numerous comments on its proposal and, in response, made slight adjustments to the Project's size and design. In August 2017, the Forest Service prepared a 172-page environmental assessment (EA), finding that the Project would have no significant impact on the environment. *See* AR5369–540. In December 2017, the Forest Service issued a Draft Decision Notice indicating its intent to move forward with the Project as then-designed. Petitioners and others filed objections. As a result of the objection process, the Forest Service again made slight adjustments to the Project's size and design. Finally, on April 30, 2018, the Forest Service issued its Final Decision Notice, authorizing implementation of the Project.

Petitioners initiated this suit on April 10, 2019.  The Petition alleges three counts of NEPA and APA violations.  In Count One, Petitioners contend the Forest Service failed to disclose and analyze the Project's indirect and cumulative impacts on climate change in violation of NEPA.  In Count Two, Petitioners allege that the Forest Service ran afoul of NEPA by failing to adequately consider relevant science concerning the Project's potential impact on mycelium.[6]  Count Three asserts another NEPA violation due to the Forest Service's failure to prepare an environmental impact statement (EIS) for the Project.

For each count, Petitioners allege the Forest Service's conduct was arbitrary and capricious under the APA.  Accordingly, the Petition seeks a declaration of the Forest Service's alleged violations, injunctive relief precluding the Project from moving forward until those violations are cured, and costs and fees.

## II.  Legal Standards

Petitioners bring their claims under NEPA, the basic national charter for protecting the environment.   NEPA places "upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action [and] ensures that the agency will inform the public that it has indeed considered environmental concerns in its

---

[6]  Mycelium is the vegetative part of a fungus, such as a mushroom.  A fungus absorbs nutrients from its environment through the mycelium, which breaks down food sources in the soil.  Mycelium serve an important role in certain ecosystems due to their role in the decomposition of plant material, among other reasons.

decisionmaking process." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).   NEPA does not "mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

When a proposed major federal action may significantly affect the quality of the environment, a federal agency must prepare a "detailed statement" known as an EIS.  *See* 42 U.S.C. § 4332(2)(C).  Where it is unclear whether a proposed project may significantly affect the quality of the environment, a federal agency may prepare an EA to "briefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or [issue] a finding of no significant impact."  40 C.F.R. § 1508.9(a)(1).  When an EA reveals that a proposed action will have significant potential effects, the agency must prepare an EIS.  42 U.S.C. § 4332.  If the agency concludes the action "is unlikely to have a significant impact, it may issue a finding of no significant impact and proceed." *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1166 (10th Cir. 2012).

Judicial review of agency action under NEPA is governed by the APA.   The reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Review under this standard is deferential to the agency—"[a] presumption of validity attaches to the agency action and the burden of

proof rests with the parties who challenge such action." *Hillsdale*, 702 F.3d at 1165. The

court's role is not to "substitute its judgment for that of the agency as to the

environmental consequences of its actions." *Kleppe v. Sierra Club*, 427 U.S. 390, 410

n.21 (1976). Instead, the court only looks to insure that the agency has "taken a 'hard

look' at environmental consequences." *Id.* (quoting *Nat. Res. Def. Council v. Morton*,

458 F.2d 827, 838 (D.C. Cir. 1972)).

To survive arbitrary and capricious review, an agency must "examine the relevant

data and articulate a rational connection between the facts found and the decision made."

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 713 (10th Cir.

2009). Agency action will not pass muster where the agency "relied on factors which

Congress has not intended it to consider, entirely failed to consider an important aspect of

the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view

or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto.*

*Ins. Co.*, 463 U.S. 29, 43 (1983).

But courts will only set aside an agency's decision for "substantial procedural or

substantive reasons." *Silverton Snowmobile Club v. U.S. Forest Serv.*, 443 F.3d 772, 780

(10th Cir. 2006). Deficiencies that are "mere 'flyspecks' and do not defeat NEPA's goals

of informed decisionmaking and informed public comment will not lead to reversal."

*Hillsdale*, 702 F.3d at 1165.

# III.  Analysis

Petitioners attack the Forest Service's failure to consider the Project's effects on climate change, its conclusions with respect to the Project's effects on mycelium, and its decision to not conduct an EIS.  These are considered in turn.

## A.  Climate Change

Petitioners argue the Forest Service violated NEPA regulations by failing to consider foreseeable green house gas (GHG) emissions and the indirect and cumulative effects of the Project on global warming.  In determining the significance of a proposed action, agencies must consider a number of factors, including "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts."  40 C.F.R. § 1508.27(b).  But the touchstone of concern under NEPA remains whether the proposed action will have a "significant" impact, and agencies must only "discuss impacts in proportion to their significance."  40 C.F.R. § 1502.2; *see also Hillsdale*, 702 F.3d at 1176 ("[A]n agency must consider only every *significant* aspect of a proposed action" (quoting *Baltimore Gas & Elec. Co.*, 462 U.S. at 97) (emphasis in original)).  Thus, where indirect or cumulative impacts are so remote as to be indiscernible, those impacts need not receive attention from the agency.  *See Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1253 (10th Cir. 2011) ("[C]umulative impacts that are too speculative or hypothetical to meaningfully contribute to NEPA's goals of public

disclosure and informed decisionmaking need not be considered."); *see also* 40 C.F.R. § 1502.2 (stating analysis of a project's impacts should not be "encyclopedic").

In approving the Project, the Forest Service conceded that the Project "would contribute to CO2 emissions," but it concluded that "emissions from the proposed action are expected to be of such small scale that they would have little bearing on climate change."  AR4637–38.  Petitioners challenge this assertion, arguing that the Project will have a climate impact because (1) the biomass fuel generated by the Project will result in GHG emissions; (2) the Project will disrupt the soil, eliminating its effectiveness as a carbon sink; and (3) the logging will require trucks, which produce emissions.  (*See* Doc. 22 at 13–14.)  As a result of these effects, Petitioners state the Project will result in "significant cumulative climate impacts."  (*Id.* at 14.)

Petitioners do little to show why the emissions from the Project are sufficiently significant to require detailed analysis under NEPA.  Petitioners cite a bevy of cases in which courts required analysis of a proposed actions' GHG emissions and climate impacts.  (Doc. 22 at 14–15 (collecting cases).)  But none of these deal with agency action analogous to the relatively small timber and biomass project at issue.  Instead, the case law Petitioners rely on involves projects, plans, or rules associated with the combustion or extraction of fossil fuels, such as coal, natural gas, or oil.  As the Ninth Circuit recently explained, biomass fuels like those involved in the Project have "unique properties" compared to fossil fuels, warranting less concern regarding their participation in climate

change.  *Helping Hand Tools v. EPA*, 848 F.3d 1185, 1191 (9th Cir. 2016) (explaining

that "emissions from biomass fuels participate in the carbon cycle differently" because

"biomass fuel stocks replenish more quickly" and "new growing plant matter . . . can

absorb excess carbon from the atmosphere," creating a "carbon sink, thereby decreasing

the net carbon dioxide released from burning biomass as fuels").[7]

Although Petitioners cite several cases in support of their argument, those cases

are factually distinguishable due to the size of the projects involved.  In each case, the

significance of emissions was often beyond doubt—either because the agency conceded it

was required to study the emissions or because the scale of the project rendered the need

to do so uncontroversial.  *See, e.g.*, *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*,

870 F.3d 1222, 1227 (10th Cir. 2017) (consideration of GHG emissions required where

agency extended lease on coal mines accounting for more than 19.7% of the United

States's annual coal production); *Citizens for a Healthy Cmty. v. U.S. Bureau of Land

Mgmt.*, 377 F. Supp. 3d 1223, 1233–34 (D. Colo. 2019) (consideration of indirect effects

of GHG emissions required for project approving the construction of at least 37 new well

pads, 25 new wells, and 25 permits for drilling in an oil and gas development); *High

Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1188 (D.

Colo. 2014) (agencies conceded need to consider emissions where agencies' action

---

[7]  This does not mean the Forest Service can always forego analysis of GHG
emissions or climate change impacts when conducting biomass projects.  Such a
categorical rule would be inappropriate under NEPA.

expected to lead to extraction of 9.1 million tons of coal, valued at over a trillion dollars); *see also WildEarth Guardians v. Zinke,* 368 F. Supp. 3d 41, 55 (D.D.C. 2019) (emissions analysis required for project approving the issuance of 473 oil and gas leases issued through eleven different lease sales, covering over 460,000 acres of land in Wyoming, Utah, and Colorado).   Due to the size of these projects and the amount of reasonably foreseeable emissions involved, these cases present a poor analogy to the Project at issue.

A more apt comparison is *Hapner v. Tidwell*, 621 F.3d 1239 (9th Cir. 2010). There, the Forest Service proposed a project authorizing 810 acres of logging and 300 acres of prescribed burns.  *Id.* at 1242, 1245.  Like here, the Forest Service declined to discuss climate change impacts in detail in the EA for the project.  *Id.* at 1245.  Yet, the Ninth Circuit, relying on the fact that "the Project involve[d] a relatively small amount of land," found the Forest Service "adequately considered the Project's impact on global warming in proportion to its significance."  *Id.*   This court concludes the same result is warranted here.

Under Petitioners' argument, any project expected to contribute *any* CO2 emissions could be categorized as requiring an EIS due to the allegedly cumulative significant impact such emissions have on the climate.  Such a result strays from NEPA's central focus on significant impacts.  *Hillsdale*, 702 F.3d at 1166.  It would also flip on its head the tiered structure envisioned by NEPA—under which agencies must only consider

11

impacts in proportion to their significance and may dedicate less resources to studying smaller, less significant projects.  *See* 40 C.F.R. § 1502.2

Here, Petitioners fail to carry their burden to show that the Project's CO2 emissions will likely result in a cumulatively significant impact.  Accordingly, the Forest Service did not run afoul of NEPA or act arbitrarily or capriciously in not analyzing the effects of these impacts further.

### B.  *Mycelium*

Petitioners next contend the Forest Service approved the Project without adequately considering scientific studies suggesting the proposed logging would severely damage the fungal community in the Project area.  This, they claim, constitutes a failure to "insure scientific integrity," 40 C.F.R. § 1502.24, and resulted in a decision running "counter to the evidence before" the agency, thereby violating the APA.  *State Farm Mut. Auto. Ins.*, 463 U.S. at 43.  This court disagrees.

The EA states the Project is "likely to change the dominance of species in fungal communities due to the shift in dominance from live to dead tree roots below ground." AR5456.  It also states "there may be less fungal activity in 10 years after clearcut."  *Id.* In response to objections on this issue, the Forest Service then expanded on this significantly.  AR5749–52.  In several places, the Forest Service clarified that disturbances to the soil may reduce the existence of some fungi there.  AR5749 ("[t]hese disturbances . . . reduce" some fungi); *id.* ("After disturbance and as roots die, arbuscular

12

mycorrhizal and ectomycorrhizal fungi may be depleted.").  The Forest Service also noted that "as herbs, shrubs and new trees develop, diversity and populations of mycorrhizal fungi increase."  AR5750.  Taken together, these statements reflect the conclusions in the EA: that after logging, the makeup of the fungal community will shift and that fungal activity may be reduced overall.  *See* AR5456.

But amidst its analysis in response to objections, the Forest Service also stated "[t]ypically, disturbance results in an increase in fungal biomass and diversity."  AR5749 (citing Zak 1992 study).  This statement stands somewhat in contrast with some of the Forest Service's conclusions in the EA.

Petitioners argue that (1) the Forest Service's consideration of the fungal community in the Project area was insufficient, and (2) the Forest Service reached conclusions inconsistent with the scientific studies it relied on.  Neither argument has merit.

With respect to the sufficiency of the analysis, Petitioners would like to have seen further discussion of the "importance of mycorrhizae" to the forest's health generally. (Doc. 22 at 19).  But in an EA "there should be only enough discussion to show why more study is not warranted."  *Jarita Mesa Livestock Grazing Assoc. v. U.S. Forest Serv*., 301 F. Supp. 3d 1010, 1027 (D.N.M. 2017).  It is true that the record contains resources emphasizing the importance of fungi to forest health at large, but the Forest Service considered the Project's effect on the fungal community in the botany report and the EA

as well as in responses to public comments and objections.  This is sufficient in the context of an EA.  *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, 250 F. Supp. 3d 1068, 1074 (D. Utah 2017) ("[T]he depth of discussion and analysis required is different depending on whether the document is an EIS or an EA . . . an EA is a concise public document that must includ[e] . . . only brief discussions of the environmental impacts."). The fungal community was not "an important aspect of the problem" that the Forest Service "failed to consider."  *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.  To the contrary, this court is satisfied that the Forest Service took the requisite "hard look" at the issue.  *Kleppe*, 427 U.S. at 410 n.21.

Petitioners' second argument—that the Forest Service's conclusions in the record ran contrary to the evidence before it—similarly fails.  Petitioners attack two Forest Service statements in particular as refuted by the scientific evidence.  First, Petitioners argue the Forest Service's claim that disturbances such as logging "typically . . . result[] in an increase in fungal biomass and diversity," AR5749, is unsupported by the scientific evidence considered.  Petitioners are correct that studies in the record refute this contention.  *See* AR4735 (Hagerman 1999) (stating that a "dramatic decline" occurred in the "diversity of mycorrhizae two growing seasons after logging and a virtual elimination [occurred] after 3 years"); AR4757 (Durall 2006) (concluding "clearcut logging" was likely a main factor in causing lower fungal "occurrence, diversity, and abundance").  But

Petitioners are incorrect that every erroneous statement in an agency's analysis rises to the level of arbitrary and capricious conduct.  *See Richardson*, 565 F.3d at 704.

Here, assuming without deciding that the Forest Service's statement was unsupported by the scientific evidence in front of it, this court holds the agency's conduct was not arbitrary and capricious.  Critically, the statement that Petitioners seize on came after the Forest Service had concluded in the EA that "there may be less fungal activity in 10 years after clearcut." *Id.*  In addition, it came amidst other analysis suggesting that the Project would result in less fungal activity. *See* AR5749.  These additional statements diminish the import of the Forest Service's erroneous statement, which came buried in responses to objections at the end of a years-long project approval process.  Accordingly, this court holds the complained-of sentence only a "flyspeck," *Richardson*, 565 F.3d at 704, and not a "substantial" error sufficient to warrant remand.  *Silverton*, 433 F.3d at 780.

The second sentence Petitioners claim is contrary to the scientific evidence is the Forest Service's statement that "fungal propagules (spores) are effectively dispersed by wind, and allow ready colonization of available habitat."  AR5749–50.  Petitioners point to two studies as contradicting this point: the Burns 1995 study and the Hagerman 1999 study.  Neither shows the Forest Service reached a conclusion counter to the evidence before it.

15

The Burns study found that although "late-stage fungi" had difficulty establishing by spores, "early stage fungi" were adept at it.  AR4719.  Moreover, from the study, it appears "early stage fungi" would be the type to be first reintroduced as the forest began to regenerate.  *Id.*  Thus, the Burns study seems to support the Forest Service's conclusion that fungi in clearcut areas could reestablish themselves through spore dispersal.

The Hagerman study is more circumspect.  It states that "inoculum, such as spores, will disperse into disturbed areas," but concluded that "their overall contribution to the inoculum potential of these soils is thought to be low."  AR4727.  While this could be read as casting doubt on the Forest Service's statement, it does not represent a wholesale contradiction of the Forest Service's claim.  But even assuming it does, this court finds this one study, standing alone, insufficient to render the Forest Service's conduct arbitrary or capricious.  As the Tenth Circuit has held, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."  *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1057 (10th Cir. 2011).

### C.  An EIS

Lastly, Petitioners contend the Forest Service was required to prepare an EIS.  But because Petitioners have failed to show that the Project may have a significant impact on the environment, this argument fails.  *See* 42 U.S.C. § 4332(2)(C).

As the Forest Service did here, an agency may perform an EA in considering whether a full EIS is necessary.  If the EA leads the agency to conclude that an action will have no significant impact, an EIS is unnecessary.  The agency's decision to issue a finding of no significant impact "is a factual determination which implicates agency expertise."  *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1274 (10th Cir. 2004).  Accordingly, this decision is reviewed under the arbitrary and capricious standard. *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1262 (10th Cir. 2019).

In assessing a project's significance, agencies must consider the project's "context" and "intensity."  40 C.F.R. § 1508.27.  This inquiry requires analysis of numerous factors, including (1) "whether the action is related to other actions with individually insignificant but cumulatively significant impacts," (2) "the degree to which the possible effects on the human environment are likely to be highly controversial," and (3) "the degree to which the action . . . represents a decision in principle about a future consideration."  *Id.*

Petitioners assert that these three factors rendered an EA insufficient and required an EIS.  They argue (1) the Project's emissions will result in cumulatively significant climate impacts, (2) the Project is highly controversial, and (3) the Forest Service's refusal to discuss climate impacts represents a decision in principle about future considerations.  None of these contentions has merit.

17

Petitioners' first argument is duplicative of its contention, addressed above, that the Forest Service acted arbitrarily and capriciously in failing to discuss the indirect and cumulative impacts of the Project's CO2 emissions on climate change.  Although this court recognizes that some projects may produce sufficient emissions to necessitate an EIS studying potential climate effects, Petitioners point to no analogous case law requiring the Forest Service to engage in such an analysis for a project of this type and size.  To the contrary, where similar timber projects are concerned, courts routinely permit the Forest Service to proceed after completing only an EA.  *Hapner*, 621 F.3d at 1245; *see also Conner*, 920 F.3d at 1262 (holding EA sufficient for project involving 2,370 acres of clearcuts, 6,765 acres of thinning, 345 acres of precommercial thinning, and 6,040 acres of prescribed burns).  Accordingly, this factor does not require an EIS.

Petitioners' second argument similarly fails.  Although Petitioners note that the Project has engendered public comments and opposition, they have failed to show "a substantial dispute as to the size, nature, or effect of the action."  *Hillsdale*, 702 F.3d at 1181 (holding "[c]ontroversy in this context does not mean opposition to a project, but rather a substantial dispute as to the size, nature, or effect of the action").

Finally, Petitioners' contention—that the Forest Service's "refusal to discuss climate impacts represents a decision in principle about future considerations"—also fails.  (Doc. 22 at 28.)  The record contradicts any such contention.  The EA states the Project is "not a precedent setting decision" and "will not set a regional or national

18

precedent." AR5523.  Moreover, the portion of the record cited by Petitioners states that "emissions from the proposed action are expected to be of such small scale that they would have little bearing on climate change."  AR4637–38.  This suggests the Forest Service was making a project-specific decision, not a decision in principle.

Collectively, the factors Petitioners rely on fall well short of showing that the Forest Service engaged in a "clear error of judgment" in finding no significant impact and declining to prepare an EIS.  Accordingly, this court finds this decision was neither arbitrary nor capricious.

## IV.  Conclusion

For the reasons stated above, this court hold Petitioners fail to show that the Forest Service violated NEPA or acted arbitrarily or capriciously in approving the Project. Accordingly, this court dismisses the Petition and grants judgment to the Forest Service on all counts.

Dated September 3, 2020      BY THE COURT:

*s/Timothy M. Tymkovich*
Hon. Timothy M. Tymkovich